**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FELECIA B.,[1]          ) | |
|                  ) | |
|         **Plaintiff,**     ) | |
|                  ) | |
| **v.**                ) | **Case No. 25-cv-944 (GMH)** |
|                  ) | |
| **FRANK BISIGNANO,[2] Acting** ) | |
| **Commissioner of Social Security,** ) | |
|                  ) | |
|         **Defendant.**   ) | |
|                  ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Felecia B. filed this action seeking to reverse the final decision of the Acting

Commissioner of Social Security, Frank Bisignano ("Defendant" or "the Commissioner"), denying

her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act,

42 U.S.C. § 405(g).  Plaintiff alleges that the Administrative Law Judge ("ALJ") who handled her

claim failed to properly evaluate opinion evidence in determining that she is not disabled.  For

those reasons, Plaintiff asks that the ALJ's decision denying benefits be vacated and that the case

be remanded for further administrative proceedings.  The Commissioner takes the opposite

position and urges affirmance of the ALJ's ruling.  Upon consideration of the parties' briefs and

the administrative record, the Court denies Plaintiff's motion and grants Defendant's motion.[3]

---

[1] Plaintiff's name has been partially redacted in accordance with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Memorandum from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt. to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf (last visited Aug. 17, 2022).

[2] The current Commissioner of Social Security is substituted as Defendant under Rule 25(d) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 25(d).

[3] The relevant docket entries for purposes of this Memorandum Opinion are:  (1) the administrative record, ECF No. 5 and its attachments; (2) Plaintiff's motion for judgment of reversal, ECF No. 8; (3) Defendant's motion for judgment

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework

To be eligible for DIB benefits under the Social Security Act, the Social Security Administration ("SSA") must find a claimant to be "disabled," meaning that the individual is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). To make that determination, an ALJ gathers evidence, holds a hearing, takes testimony, and performs the following five-step, sequential inquiry of the disability claim:

> Step one:  whether the claimant is engaging in "substantial gainful activity";[4]
>
> Step two:  whether the claimant has a "severe" medically determinable physical or mental impairment or combination of impairments;[5]
>
> Step three:  whether the claimant's impairment is equivalent to one of the disabling impairments listed in the appendix of the relevant regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings");
>
> After step three, the ALJ determines the claimant's residual functional capacity ("RFC")— i.e., the most he or she is able to do notwithstanding his or her physical and mental limitations;

---

of affirmance and opposition to Plaintiff's motion for judgment of reversal,ECF No. 10; and (4) Plaintiff's combined opposition to Defendant's motion for judgment of affirmance and reply to Defendant's opposition, ECF No. 12. The page numbers cited herein are those assigned by the Court's CM/ECF system.

[4] "Substantial gainful activity" is work that "[i]nvolves doing significant and productive physical or mental duties" and is "done (or intended) for pay or profit." 20 C.F.R. § 404.1510; *see also* 20 C.F.R. § 416.910 (defining "substantial gainful activity" for the purposes of Social Security supplemental security income ("SSI") claims). "If [the claimant is] doing substantial gainful activity, [the Social Security Administration] will find that [the claimant is] not disabled." 20 C.F.R. § 404.1520(a)(4)(i); *see also* 20 C.F.R. § 416.920(a)(4)(i) (defining the step one inquiry for SSI claims).

[5] An impairment or combination of impairments is "severe" if it "significantly limit[s]" a claimant's "physical or mental ability to do basic work activities," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "seeing, hearing, [or] speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; exercising judgment; "[r]esponding appropriately to supervision, co-workers[,] and usual work situations"; or "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522; *see also* 20 C.F.R. § 416.922 (defining a severe impairment for the purposes of SSI claims).

Step four:  whether the impairment prevents the claimant from performing his or her past relevant work;[6] and

Step five:  whether the claimant, in light of his or her age, education, work experience, and RFC, is unable to perform another job available in the national economy.[7]

*See* 20 C.F.R. § 404.1520; *see also* 20 C.F.R. § 416.920 (outlining the five-step sequential inquiry for SSI claims); *Butler v. Barnhart*, 353 F.3d 992, 997[ (D.C. Cir. 2004).  "An affirmative answer to question 1 or negative answers to questions 2 or 4 result in a determination of no disability. Affirmative answers to questions 3 or 5 establish disability."  *Hines v. Bowen*, 872 F.2d 56, 58 (4th Cir. 1989).

The claimant bears the burden of proof at the first four steps of the evaluation.  *Callahan v. Astrue*, 786 F. Supp. 2d 87, 89 (D.D.C. 2011).  At step five, the burden shifts to the Commissioner to identify specific jobs available in the national economy the claimant can perform. *Id.*  In making this determination, an ALJ may call a vocational expert ("VE") to testify at the hearing as to whether, based on the claimant's RFC, he or she can perform other work that exists in the national economy.  *Id.* at 90.

---

[6] "At the time of the ALJ's decision, past relevant work was defined as 'work that [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it.'"  *Tina W. v. Comm'r, SSA*, No. 24-4029, 2024 WL 5165687, at *3 (10th Cir. Dec. 19, 2024) (alterations in original) (quoting 20 C.F.R. § 404.1560(b)(1) (2022)); *see also* 20 C.F.R. § 416.960(b)(1) (2022) (defining "past relevant work" for the purposes of SSI claims).  If the claimant can perform his or her past relevant work, a finding of "not disabled" is required.  20 C.F.R. § 404.1520(a)(4)(iv); *see also* 20 C.F.R. § 416.920(a)(4)(iv) (defining the step four inquiry for SSI claims).

[7] At the fifth step, the ALJ may, "'[i]n the ordinary case, . . . resort[ ] to the applicable medical vocational guidelines'" (also known as "the grids") to determine whether the claimant is disabled.  *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.  "The grids 'take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.'"  *Id.* (citation modified) (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996)). Additionally, in determining whether "unskilled, sedentary, light, and medium jobs exist in the national economy" that a claimant can perform, a VE may rely on the Dictionary of Occupational Titles, 20 C.F.R. § 404.1566(d)(1), which "provides a brief description of occupations within the national economy and lists the capabilities that each occupation requires of a worker."  *Callahan v. Astrue*, 786 F. Supp. 2d 87, 90 (D.D.C. 2011).

### B.    Plaintiff's Disability Claims and Procedural History

Plaintiff was born on September 7, 1969, and has a twelfth-grade education.  ECF No. 5-5 at 4; ECF No. 5-6 at 14.  She worked as a police officer for Howard University from January 1997 until February 2008 when she suffered a fall at work.  ECF No. 5-6 at 2; ECF No. 5-7 at 33.  She stopped working due to the resulting injuries and lack of light work available at Howard University.  ECF No. 5-7 at 33.

Plaintiff filed an application for DIB on December 16, 2022, claiming disability beginning December 1, 2013.  ECF No. 5-2 at 23.  She reported experiencing disabling symptoms from obesity, diabetes mellitus type II, and degenerative joint disease of the left shoulder and left knee. *Id.* at 26.  Plaintiff's claim was denied on March 27, 2023, and again on June 29, 2023, after reconsideration.  *Id.*  Plaintiff requested a hearing on July 19, 2023, appearing before the ALJ in Washington, D.C. on January 11, 2024.  *Id.*

During the hearing, the ALJ took testimony from Plaintiff and a VE.  *Id.* at 43.  Plaintiff testified that after her 2008 workplace injury and resulting left knee surgery, future surgeries made it difficult to return to her prior position.  *Id.* at 59.  She described feeling constant pain throughout her body from her spine, left shoulder, and left knee, experiencing muscle spasms, cramps, and stiffness.  *Id.* at 54, 56.  To combat the pain, Plaintiff said she took medication such as "Oxy and Percocet" that did help, but due to allergic reactions and development of diabetes, she worked to get off the medicine.  *Id.* at 56–57.  She explained being unable to drive because the medication left her drowsy.  *Id.* at 55.  Plaintiff testified that she could walk a couple of blocks with rest in between and occasionally needed a cane.  *Id.* at 53.  Plaintiff said she could stand and sit anywhere from 30 to 45 minutes depending on her pain level but she could not squat or kneel.  *Id.* at 53–54.  She further described difficulties with daily life.  *Id.* at 55.  She testified that her daughter handled

tasks throughout the household and helped Plaintiff with self-care. *Id.* Plaintiff testified that she became anxious around crowds and feared falling or forgetting something. *Id.* at 57. She described her medical appointments and treatments such as going to therapy on a regular basis, taking cortisone shots, and wearing braces. *Id.* at 58.

After Plaintiff testified, the ALJ asked the VE for a classification of Plaintiff's prior work, and the VE described it as a police officer performing medium and skilled work, lifting up to 25 pounds. *Id.* at 62. The ALJ then asked the VE to assume three different hypothetical individuals of Plaintiff's age, education, and past work, one performing light work with no mental limitations, the second performing light work with mental limitations, and the third performing sedentary work with mental limitations.[8] *Id.*

For the hypothetical individual involving light work with no mental limitations, the ALJ asked the VE to assume the individual could lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; could frequently reach in all directions, push, pull, and operate hand controls with the left arm; could occasionally push, pull, and operate foot controls with the left leg; could sit, stand, and walk for six hours during an eight-hour workday; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; could occasionally be exposed to workplace hazards like moving mechanical parts; and could never climb ropes, ladders, or scaffolds. *Id.* at 62–63. In response, the VE testified that while a person limited to light work with no mental limitations could not perform Plaintiff's prior work as a police officer, other jobs were available in the economy that could be performed, including office helper, retail product marker, and mail sorter.[9] *Id.* at 64–65. The VE testified that none of those jobs had a production pace or

---

[8] As mental limitations are not at issue in this case, the discussion here focuses on the testimony concerning the hypothetical individual performing light work with no mental limitations.

[9] The VE testified the hypothetical individual limited to light work with mental limitations could perform the same jobs. ECF No. 5-2 at 64. For the hypothetical individual limited to sedentary work with mental limitations, the VE

rate, that all of them allowed breaks, and that the Dictionary of Occupational Titles did not contain information on matters such as a worker's preference for utilizing one extremity over the other in performing the job, the use of a cane, the number of breaks the job allows, and if a worker was off task or absent. *Id.* at 66–67. The VE further testified that if the limitations from the hypotheticals were removed or less restrictive, such as if the hypothetical individual could now climb ladders freely, the office helper, retail product marker, and mail sorter jobs would still be available. *Id.* at 68.

In response to questions from Plaintiff's counsel, the VE testified that in most circumstances, an individual employed in the identified jobs could sit and stand at will but that that the use of a cane would prevent the hypothetical individual performing most of the jobs requiring light work. *Id.* at 69. The VE lastly testified that all the jobs she identified would allow one absence a month and a maximum of ten percent of time off task in addition to the regular breaks. *Id.* at 70.

### C. The ALJ's Decision

The ALJ issued his decision denying benefits on April 8, 2024. ECF No. 5-2 at 36. The following summary of the ALJ's decision focuses on the matters most relevant to issues on appeal, namely the formulation of Plaintiff's RFC, Plaintiff's medical evidence and testimony regarding her symptoms associated with her shoulder and knee impairments, her daily activities, and statements made by Dr. Craig Faulks.

1.    Substantial Gainful Employment, Severe Impairments, and the Listings

At step one of sequential inquiry, the ALJ found Plaintiff had not engaged in substantial gainful activity from her alleged onset date of December 1, 2013, 2018, through the date she was

---

testified other jobs were still available that could be performed, including addresser, table worker, and stuffer. *Id.* at 66.

last insured, March 31, 2018.  *Id.* at 26.  At step two, the ALJ determined Plaintiff had the following severe impairments: obesity, diabetes mellitus type II, degenerative joint disease of the left knee, and degenerative joint disease of the left shoulder.  *Id.*

At step three, the ALJ found none of Plaintiff's impairments met or medically equaled the severity of an impairment in the Listings.  *Id.* at 28.  Reaching this finding, the ALJ next assessed Plaintiff's RFC.  *Id.* at 29.

　　　　2.　　　Plaintiff's RFC

The ALJ determined that Plaintiff had the RFC to perform "light work . . . except she can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, can sit for 6 hours in an 8 hour workday, stand and walk for 6 hours in an 8 hour workday."  *Id.* at 29.  He found Plaintiff could frequently reach in all directions, and push, pull, and operate hand controls with the left arm and hand.  *Id.*  He further determined Plaintiff could "occasionally push, pull, and operate foot controls with the left leg and foot," and "occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl," but "never climb ropes, ladders or scaffolds."  *Id.*

To determine Plaintiff's RFC, the ALJ considered "all [Plaintiff's] symptoms" and whether the extent of those symptoms was consistent with objective medical evidence and other evidence on the record.  *Id.*  Specifically, the ALJ applied a two-step process to consider Plaintiff's symptoms.  *Id.*  The ALJ first determined whether Plaintiff had medically determinable impairments that could reasonably be expected to cause her symptoms.  *Id.* at 30.  Answering that question in the affirmative, the ALJ then found that the objective medical evidence and other evidence in the record were "not entirely consistent" with Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms.  *Id.*

In reaching that conclusion, the ALJ first detailed Plaintiff's complaints regarding her symptoms and how they affected her ability to work and perform daily activities, drawing from Plaintiff's hearing testimony and other evidence on the record. *Id.*; *see also* ECF No. 5-2 at 45–61; ECF No. 5-6 at 35–42. He noted Plaintiff's description of health problems resulting in difficulties with "lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, seeing, with memory, completing tasks, with concentration, understanding, using hands and getting along with others." ECF No. 5-2 at 30. The ALJ also noted that Plaintiff reported spending less time engaging in social activities and hobbies due to her symptoms. *Id.* The ALJ also mentioned Plaintiff's statements that she could complete chores with rests in between and had some difficulties with personal care such as dressing. *Id.* He additionally noted Plaintiff's testimony that she could travel by walking or public transportation. *Id.*

The ALJ then found that Plaintiff's "allegations of disabling physical functional limitations" from her impairments were neither consistent with nor supported by the medical evidence in the record. *Id.* The ALJ first considered Plaintiff's claims regarding obesity and found that Plaintiff had no "significant or ongoing physical functional limitations" because of her obesity either alone or in combination with another impairment, concluding that she was not limited "to the extent alleged by obesity." *Id.* Addressing diabetes mellitus type II next, the ALJ found the "general lack of objective evidence that would indicate that [Plaintiff] experienced any functional limitations lasting 12 months or more" and her ability to manage the condition through dieting, exercise, and medication suggested that she was not as limited as she alleged. *Id.* at 30.

The ALJ then considered Plaintiff's claims of physical limitations from her two remaining impairments, degenerative joint disease of the left knee and left shoulder, which are the focus of her appeal. *Id.* at 31. Plaintiff reported symptoms stemming from her knee such as joint stiffness

and pain, requiring medication like oxycodone and gabapentin as well as injections to provide relief. *Id.*; *see also* ECF No. 5-7 at 135, 145, 162, 246, 422. The ALJ noted that in addition to those medications, Plaintiff said she took prescription medicine to help manage pain while walking. ECF No. 5-2 at 31; *see also* ECF No. 5-7 at 60, 80, 83. The ALJ additionally described Plaintiff's reports of "numbness and pain in her left upper extremity and shoulder" and "restricted range of motion." ECF No. 5-2 at 31; *see also* ECF No. 5-7 at 60, 82–83, 408.

However, the ALJ found that Plaintiff's claims were "not consistent with the objective record." ECF No. 5-2 at 31. In reaching that conclusion, the ALJ referenced medical evidence showing Plaintiff's favorable reaction to treatment for her shoulder, leaving her shoulder motion "well-preserved with reasonable strength in abduction," *id.*; *see also* ECF No. 5-7 at 74, and a shoulder x-ray that was "unremarkable," ECF No. 5-2 at 31; *see also* ECF No. 5-7 at 74. While the ALJ acknowledged a decrease in Plaintiff's shoulder abduction, he noted that it was minor. ECF No. 5-2 at 31; *see also* ECF No. 5-7 at 82. Similarly, with respect to Plaintiff's knee, the ALJ noted Plaintiff's favorable reaction to injection treatments that led to a good range of motion. ECF No. 5-2 at 31; *see also* ECF No. 5-7 at 75. The ALJ discussed Plaintiff's retention of good knee flexion and extension despite some diminishment, *see* ECF No. 5-2 at 31; *see also* ECF No. 5-7 at 62, and highlighted a general lack of evidence that would support a diagnosis of clubbing, cyanosis, or edema in Plaintiff's lower extremities, *see* ECF No. 5-2 at 31; *see also* ECF No. 5-7 at 124 142. Lastly, the ALJ noted various medical records indicating that Plaintiff "maintained normal sensation in both her shoulder and knee[,] denied joint pain and weakness[,] had [a] normal range of motion, normal strength, and no tenderness to palpation." ECF No. 5-2 at 31; *see also* ECF No. 5-7 at 62, 82; ECF No. 5-10 at 65; ECF No. 5-14 at 31, 43–44.

The ALJ further found Plaintiff's hearing testimony and evidence regarding her ability to engage in daily activities to be inconsistent with her claims of disabling conditions. ECF No. 5-2 at 31; *see also* ECF No. 5-2 at 45–61; ECF No. 5-6 at 35–42. The ALJ reasoned that Plaintiff's ability to complete chores and other daily activities like cleaning, shopping, and taking walks indicated she was able to utilize her upper and lower extremities. ECF No. 5-2 at 31. The ALJ concluded that this evidence showed that Plaintiff had improved in her ability to perform daily and work-related activities, both highlighting the inconsistency of Plaintiff's claims of limitation and suggesting that she could meet the functioning levels established by the RFC. *Id.* The ALJ concluded that Plaintiff's claims of disabling shoulder and knee pain were "contradicted [by her] consistent substantial activities of daily living and the benign medical findings noted" in the opinion. ECF No. 5-2 at 32. Nevertheless, the ALJ said he accommodated Plaintiff's shoulder and knee impairments in her RFC by, for example, limiting her to only "occasional pushing, pulling, and operating foot controls with the left leg." *Id.*

In formulating Plaintiff's RFC, the ALJ further considered the medical opinions in the record and prior administrative medical findings. *Id.* at 32. The SSA requested that Drs. Patricia Cott, Veronica Bedeau, and Eduardo Haim review Plaintiff's medical records, and each concluded that Plaintiff had no medically determinable impairment. *Id.*; *see also* ECF No. 5-3 at 3–6, 8–11. The ALJ did not find those conclusions persuasive, however, because they were not consistent with evidence showing that Plaintiff's shoulder and knee pain required treatment of prescription medication, which suggested medically determinable impairments did in fact exist. ECF No. 5-2 at 32; *see also* ECF No. 5-7 at 135, 145, 162, 246, 422. The ALJ did not evaluate the persuasiveness of statements from Dr. Ajirioghene Igbide, reasoning they did not qualify as a

"medical opinion."[10]  ECF No. 5-2 at 33–34; *see also* ECF No. 5-7 at 4.  The ALJ further found

the medical statements and opinions of Elma Ampaso, N.P., were not persuasive because the stated

limitations were not consistent with the objective record.  ECF No. 5-2 at 32–33; *see also* ECF

No. 5-7 at 2–3.  Plaintiff does not challenge the ALJ's treatment of any of these opinions.

Similarly, the ALJ found the statements and opinions of Dr. Craig Faulks[11] not

persuasive—a conclusion which is the primary focus of Plaintiff's appeal to this Court.  ECF No.

5-2 at 33.  Dr. Faulks examined and treated Plaintiff in person on several occasions.  *Id.*; *see also*

ECF No. 5-7 at 9, 12–13, 20, 25, 45–46.  Of particular interest to Plaintiff's appeal, Dr. Faulks

provided two "Disability Certificates" on June 23, 2016, and December 22, 2016.  ECF No. 5-7 at

9, 12.  The June 23 Disability Certificate states—in full—that Plaintiff will be "totally

incapacitated" from June 23, 2016, to August 2, 2016.  *Id.* at 9.  The December 22 Disability

Certificate states that Plaintiff will be "partially incapacitated" on a permanent basis and includes

three additional remarks without further elaboration: "limited use of upper extremity," "limit

standing/walking" and "sedentary duty."  *Id.* at 12.  The ALJ concluded Dr. Faulks' statements

contained in the Disability Certificates were unpersuasive for several reasons.  First, the ALJ found

that Dr. Faulks' statements were effectively a "determination of disability" that infringed on a

decision "reserved to the Commissioner."  ECF No. 5-2 at 33.  More, while the ALJ acknowledged

that Dr. Faulks had the benefit of in-person examinations of Plaintiff, he found that Dr. Faulks'

conclusions comprised a "somewhat speculative opinion" that was inconsistent with the objective

record.  *Id.*  In support of that finding, the ALJ pointed to Plaintiff's testimony and other evidence

indicating her symptoms improved with treatment and demonstrating her ability to complete

---

[10] Despite not evaluating the persuasiveness of Dr. Igbide's statements, the ALJ noted the statements were still considered.  ECF No. 5-2 at 32.

[11] The ALJ's opinion utilizes the spelling "Fawlks" and has been changed here to "Faulks."

chores and other daily activities. *Id.*; *see also* ECF No. 5-2 at 45–61; ECF No. 5-6 at 35–42; ECF No. 5-7 at 62, 82, 123, 142; ECF No. 5-10 at 64; ECF No. 5-14 at 31, 43–44.  The ALJ reasoned, "Such evidence suggest[s] that different limitations than those stated by Dr. Fa[u]lks are warranted." ECF No. 5-2 at 33.

Ultimately in setting Plaintiff's RFC, the ALJ did not find any of the prior administrative medical findings, statements, or opinions described above persuasive. *Id.* at 34.  Instead, the ALJ found Plaintiff's RFC supported by the objective record and hearing testimony. *Id.*  The ALJ reasoned that Plaintiff's hearing testimony contradicted her own description of her limitations, and that "greater limitations than those stated in the residual functional capacity are not consistent with the longitudinal record." *Id.* at 32.  Accordingly, the ALJ concluded that the RFC "adequately considers the claimant's symptoms and conditions by limiting her to light work with limitations." *Id.*

### 3. Conclusion of the Five-Step Sequential Inquiry

At step four, the ALJ found that Plaintiff's RFC would leave her unable to perform her past relevant work as a police officer. *Id.* at 34.  Proceeding to step five, the ALJ concluded that considering Plaintiff's RFC, age, education, and work experience, other jobs existed in significant numbers in the national economy that Plaintiff could have performed, including, based on the VE's testimony, office helper, marker, and mail sorter. *Id.* at 35.  The ALJ further utilized the VE's testimony to show that even if Plaintiff were able to perform only sedentary work—rather than light work as the RFC permitted—jobs would still be available in the national economy that

Plaintiff could perform, including addresser, table worker, and stuffer. *Id.* Accordingly, the ALJ concluded Plaintiff was "not disabled." *Id.* at 36.

### D.  Appeals Council Decision

After the ALJ issues his decision, the SSA's Appeals Council denied Plaintiff's request for review on January 31, 2025, making the ALJ's decision the final decision of the Commissioner. *Id.* at 2–4.

## II.  LEGAL STANDARD

A federal district court has jurisdiction over a civil case challenging a final decision of the Commissioner. 42 U.S.C. § 405(g). A reviewing court must affirm the Commissioner's decision if it is based on substantial evidence in the record and the correct application of the relevant legal standards. *Id.*; *Butler*, 353 F.3d at 999.

"[T]he plaintiff bears the burden of demonstrating that the Commissioner's decision is not based on substantial evidence or that incorrect legal standards were applied." *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 64 (D.D.C. 2006). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It requires "more than a scintilla [of evidence], but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003) (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir 2002)). "The substantial evidence standard requires considerable deference to the decision rendered by the ALJ." *Crosson v. Shalala*, 907 F. Supp. 1, 3 (D.D.C. 1995). The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own." *Id.*; *see also Butler*, 353 F.3d at 999 (finding that the

district court's role is not to reweigh the evidence but only to determine whether the ALJ's findings are "based on substantial evidence and a correct application of the law"). However, "this standard of review requires the Court to carefully scrutinize the entire record to ensure that the Commissioner, through the ALJ, has both analyzed all of the evidence available and has sufficiently explained his/her reasoning and the weights given to the facts." *Pinkney v. Astrue*, 675 F. Supp. 2d 9, 14 (D.D.C. 2009); *see also Lane-Rauth*, 437 F. Supp. 2d at 65 ("[T]his standard of review 'calls for careful scrutiny of the entire record,' to determine whether the Commissioner, acting through the ALJ, 'has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits[.]'" (citation modified) (quoting *Butler*, 353 F.3d at 999)). Moreover, the Court's job is to "consider the grounds actually proffered by the ALJ" rather than to make those determinations for itself, *Ward v. Berryhill*, 246 F. Supp. 3d 202, 210 (D.D.C. 2017), or credit "post-hoc rationalization[s]" advanced by the parties, *Cooper v. Berryhill*, No. 16-cv-1671, 2017 WL 4326388, at *5 (D.D.C. Sep. 28, 2017); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a reviewing court "must judge the propriety of [an agency's judgment] solely by the grounds invoked by the agency"); *Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) (citing *Chenery*, 332 U.S. at 196).

### III.    DISCUSSION

Plaintiff's challenge to the ALJ's decision focuses entirely on its evaluation of Dr. Faulks' statements in the two Disability Certificates.[12] ECF No. 8-1 at 12–15. Specifically, Plaintiff

---

[12] Although the ALJ evaluated more of Dr. Faulks' statements than those included in the June 23 and December 22 Disability Certifications, *see* ECF No. 5-2 at 33, Plaintiff challenges only the ALJ's assessment of Dr. Faulks' statements in the two certificates. ECF No. 8-1 at 12 ("On June 23, 2016, Dr. Faulks opined that Plaintiff was totally incapacitated from that date until August 2, 2016. . . . On December 22, 2016, Dr. Faulks opined that Plaintiff was permanently partially incapacitated with limited use of upper extremity and limited standing and walking; she could perform sedentary duty. . . . Th[e] [ALJ's] rejection of Dr. Faulks's more restrictive opinions was improper."). Accordingly, Plaintiff has forfeited any challenge she may have brought to the ALJ's evaluation of Dr. Faulks' other statements, and the Court will not address them further herein. *See Anglers Conservation Network v. Pritzker*, 139 F.

asserts the ALJ erred in three ways when he found Dr. Faulks' statements in those certificates unpersuasive: the ALJ improperly evaluated the supportability and consistency factors, *id.* at 12; improperly considered Plaintiff's daily activities, *id.* at 12–15; and improperly cherry-picked evidence from the record, *id.* at 15. Disagreeing with Plaintiff on all counts, the Court finds that the ALJ properly evaluated Dr. Faulks' statements in the Disability Certificates and supported his decision with substantial evidence.

### A.   Dr. Faulks' Statements Infringe on Determinations "Reserved to the Commissioner"

As a threshold matter, Plaintiff's appeal ignores the first reason given by the ALJ for his finding that Dr. Faulks' statements were unpersuasive, namely, that they reflected a "determination of disability [that] is reserved to the Commissioner." ECF No. 5-2 at 33. Plaintiff makes no mention of this basis for the ALJ's decision in her opening brief. *See generally* ECF No. 8-1 at 10–16. Nor does she address the issue in her reply, even after the government raised the argument in its opening brief. See ECF No. 12 at 1–2 (Plaintiff's reply); *see also* ECF No. 10 at 14 (government's opening briefing arguing that "any statements by Dr. Faulks that Plaintiff was unable to work were due no consideration as the ultimate question of Plaintiff's ability to work is an issue 'reserved for the Commissioner'"). Accordingly, the Court finds that Plaintiff has conceded the issue. *See Holt v. Walsh Grp.*, 316 F. Supp. 3d 274, 278 (D.D.C. 2018) ("When a litigant files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded." (citation modified) (quoting *Lockhart v. Coatal Int'l Sec.*, 905 F. Supp. 2d 105, 118 (D.D.C. 2012))); *Henneghan* v. *District of Columbia*, 916 F. Supp. 2d 5, 9 (D.D.C. 2013) ("[T]he Court may treat as conceded any argument

---

Supp. 3d 102, 116 n.10 (D.D.C. 2015) ("The Court need not address this because an argument not raised in an opening brief is forfeited." (citing *Fox v. Gov't of D.C.*, 794 F.3d 25, 29–30 (D.C. Cir. 2015))).

raised in the motion which the opposing parties fail to address."). Given the narrowness of Plaintiff's appeal—confined as it is to the statements on the Disability Certificates which trigger the issue identified by the ALJ—her concession on this issue is a sufficient basis to deny her relief.

In any event, the ALJ's observation that Dr. Faulks' statements on the Disability Certificates infringed on the Commissioner's prerogative to determine the ultimate issue of disability is well-taken. Standing alone, Dr. Faulks' statements on the Disability Certificates amount to little more than conclusions that Plaintiff is disabled or partially disabled. Under the regulations applicable to claims like this one that were filed after March 27, 2017, statements from medical professionals that effectively "would direct [the Commissioner's] determination or decision" that "[a claimant is] or [is] not disabled, . . . able to work, or able to perform regular or continuing work" are due no consideration by the ALJ and need not be analyzed at all. *See* 20 C.F.R. § 404.1520b(c)(3)(i); *see also id.* § 404.1520b(c) (ALJ "will not provide any analysis about how [the ALJ] considered such evidence"). Such statements are deemed under the Social Security regulations "inherently neither valuable nor persuasive" because they seek to infringe on the ultimate disability determination which the Commissioner, not a medical professional, is to decide. *Id.* § 404.1520b(c). In the words of the regulation (and the ALJ here), it is an issue "reserved to the Commissioner." *Id.* § 404.1520b(c)(3); ECF No. 5-2 at 33.

The ALJ's characterization of Dr. Faulks' statements on the Disability Certificates as the type of evidence that is inherently unpersuasive was correct. The certificates are each quarter-page forms on Dr. Faulks' letterhead that have two checkboxes—one indicating "totally incapacitated," the other "partially incapacitated"—and a space for "remarks."[13] ECF No. 5-7 at 9, 12. The June 23 Disability Certificate has the "totally incapacitated" box checked, and,

---

[13] For those old enough to remember, the Disability Certificates have the appearance of the quarter-page forms used by administrative assistants to record telephone messages, back when that was a thing. ECF No. 5-7 at 9, 12.

16

underneath that check mark, it states "from 6/23/16 to 8/2/16." *Id.* at 9.  The remarks section is blank; there is no other handwriting on the form other than the date the form was completed ("6/23/16"), Plaintiff's name, and Dr. Faulks' signature.  *Id.*  Fairly read, Dr. Faulks' statement that Plaintiff was "totally incapacitated" appearing as it does on a form entitled "Disability Certificate," squarely seeks to address the ultimate issue reserved for determination by the Commissioner, that is, whether Plaintiff was disabled or not.  *See Stephanie G. v. O'Malley*, No. 22-cv-00904, 2024 WL 2271821, at *11 (D.D.C. May 20, 2024) (finding a doctor's opinion that a claimant was "likely permanently disabled" infringed on the Commissioner's determination of whether the claimant was disabled or not).  Consequently, under the regulations, that statement is not persuasive, as the ALJ found.  *See id.* ("Statements about whether the claimant is or is not disabled . . . fall into this category of 'unpersuasive evidence' that ALJs need not consider." (citation modified) (quoting 20 C.F.R. § 404.1520b(c)(3)(i), (v)–(vi))); *see also* 20 C.F.R. § 404.1520b(c) (the SSA "will not provide any analysis about how we considered such evidence in our determination or decision").

Similarly unhelpful, the December 22 Disability Certificate includes a checkmark in the box next to "partially incapacitated" and underneath that checkmark the word "permanently" is written.  ECF No. 5-7 at 12.  Those statements are also "inherently unpersuasive" because they, too, seek to "direct [a] determination or decision" on the ultimate issue of whether "[a claimant is] or [is] not disabled, . . . able to work, or able to perform regular or continuing work." 20 C.F.R. § 404.1520b(c)(3).  Unlike the June 23 Disability Certification remarks section that was left blank, however, there are three statements handwritten in the "remarks" section of the December 22 Disability Certification: "limited use of upper extremity," "limit standing/walking," and "sedentary duty." ECF No. 5-7 at 12.  But those statements fare no better under the Social Security

17

regulations. Taking the last statement first, a medical professional's "finding that a claimant is limited to sedentary duty" is also "an issue reserved to the Commissioner." *Barker v. Bisignano*, No. CIV-24-734, 2025 WL 1921269, at *4 (W.D. Okla. July 11, 2025). Under the Social Security regulations, "[s]tatements about what [a claimant's] residual functional capacity is using [SSA's] programmatic terms about the functional exertional levels"—including the programmatic terms "*sedentary*, light, medium, heavy, or very heavy work," 20 C.F.R. Pt. 404, Subpt. P, App. 2, sec. 200.00(a) (emphasis added)—are issues "reserved to the Commissioner" and are inherently unpersuasive. 20 C.F.R. § 404.1520b(c)(3)(v); 20 C.F.R. § 404.1520b(c). Similarly, the notations that Plaintiff has limitations in "use of upper extremity" and "standing/walking" are infirm because they fail to identify what Plaintiff "can still do despite [her] impairment(s)," as is required to qualify as a medical opinion that merits further analysis by an ALJ. *See* 20 C.F.R. § 404.1513(a)(2) (defining a medical opinion). "[I]t is not enough for a medical source to identify physical or mental status findings that indicate (or even necessitate) limitations in work-related functions; those functional limitations must be explicitly and specifically spelled out." *Devylle C. v. Kijakazi*, No. 22-cv-1061, 2023 WL 4864600, at *12 (D.D.C. July 31, 2023); *see also Louis C. v. O'Malley*, No. 24-cv-363, 2024 WL 5484077, at *12 (D.D.C. Dec. 16, 2024) ("[A] number of courts have found that 'a recommendation that a patient undertake certain ameliorative measures does not equate to a physical restriction or a judgment about what Plaintiff can still do despite her impairments.'" (quoting *Daywalt v. Kijakazi*, No. 20-cv-277, 2021 WL 3679304, at *8 (M.D.N.C. Aug. 19,

18

2021))), *report and recommendation adopted in relevant part sub nom. Colbert v. Bisignano*, 2025 WL 2992299 (D.D.C. Oct. 24, 2025).[14]

In sum, under the Social Security regulations, none of Dr. Faulks' statements in the Disability Certificates merited further analysis by the ALJ. On that basis, the ALJ's decision rejecting those statements as being unpersuasive will be affirmed.

### B. The ALJ Otherwise Properly Rejected Dr. Faulks' Statements

#### 1. Supportability and Consistency Analysis

Despite finding that Dr. Faulks' statements infringed on decisions "reserved to the Commissioner," ECF No. 5-2 at 33, the ALJ evaluated Dr. Faulks' statements under the Social Security regulations as if they were proper medical opinions. The ALJ's conclusion that the statements were unpersuasive was based on a proper application of those regulations. For that independent reason, the Court will uphold the ALJ's decision.

The governing Social Security regulations for Plaintiff's disability claim require that an ALJ "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion[]," including an opinion from a medical source who has treated the claimant. 20 C.F.R. § 404.1520c(a). Rather, medical findings from a medical source are evaluated by analyzing (1) the supportability of the opinion (that is, the "objective medical evidence and supporting explanations presented by [the] medical source to support his or her medical opinion[]") and (2) the consistency of the opinion with other evidence in the record. *Id.* § 404.1520c(b)(2), (c)(1)–

---

[14] *Compare Robinson v. Comm'r of Soc. Sec.*, No. 22-1397, 2022 WL 17168444, at *3 (6th Cir. Nov. 22, 2022) (providing the following example as a proper medical opinion that described what a claimant could still do: "no limitation with low body mobility,, ability to sit approximately 1-2 hours, and lift a maximum of 10 pounds" (citation modified)), *with Torres v. Bisignano*, No. 24-cv-1509, 2025 WL 3785659, at *6 (M.D. Tenn. Nov. 20, 2025) (finding evaluation did not qualify as a medical opinion because it discussed only a claimant's impairments without "explicitly linking those diagnoses to [the claimant's] ability to perform certain work activities" or [or] detail[ing] how those impairments would impact [the claimant's] ability to perform physical demands of work activity"), *report and recommendation adopted*, 2026 WL 19410 (M.D. Tenn. Jan. 2, 2026).

(2).  Of lesser importance are the medical source's relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the kinds and extent of examinations and testing performed, and whether the medical source examined the claimant or merely reviewed evidence; the specialization of the medical source; and "[o]ther factors" such as the medical source's familiarity with other evidence or understanding of SSA's policies.  *Id.* § 404.1520c(c)(3)–(5).  These regulations "set forth a minimum level of articulation to be provided in determinations and decisions [by an ALJ], in order to provide sufficient rationale for a reviewing adjudicator or court"; where an ALJ does not "meet these minimum levels of articulation," the court's ability to "determine whether [the plaintiff's] disability determination was supported by substantial evidence" is "frustrate[d]."  *Foley v. Comm'r of Soc. Sec. Admin.*, No. 22-cv-912, 2023 WL 2242798, at *8 (N.D. Ohio Feb. 27, 2023) (quoting *Warren I. v. Comm'r of Soc. Sec.*, No. 20-cv-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021); and then quoting *Vaughn v. Comm'r of Soc. Sec.*, No. 20-cv-1110, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021)).

Because the governing regulations stipulate that the supportability and consistency factors are the "most important" an ALJ must consider when "evaluat[ing] the persuasiveness of medical opinions," ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions" in their decisions.  20 C.F.R. § 404.1520c(a), (b)(2); *see also Carolyn W. v. Comm'r of Soc. Sec. Admin.*, No. 20-cv-423, 2022 WL 4244214, at *4 (S.D. Ohio Sep. 15, 2022) ("The regulation therefore imposes a burden of explanation, or mandatory articulation, upon ALJs.").  That said, there is no specific format that an ALJ must follow when addressing supportability and consistency, and those terms need not be used in the opinion, provided that there is sufficient explanation for a reviewing court to determine that the ALJ

analyzed those factors. *See, e.g., Gunn v. Comm'r of Soc. Sec.*, No. 20-cv-382, 2022 WL 11397816, at *4 (M.D. Fla. Mar. 23, 2022) ("While the regulations require the ALJ to articulate consideration of the supportability and consistency factors when evaluating a medical opinion from a medical source, they do not require the ALJ to use any specific language to articulate consideration of the factors. As long as the evaluation addresses the substance of the factors, the ALJ meets the articulation requirement." (citation modified)); *Cody v. Comm'r of Soc. Sec.*, Civ. A. No. 20-2620, 2021 WL 6012228, at *6 (D.S.C. Oct. 27, 2021) ("Although the ALJ here did not specifically reference the 'supportability' and 'consistency' factors while evaluat[ing] Dr. DeGarmo's opinion, the ALJ sufficiently addressed and considered these factors."), *report and recommendation adopted*, 2021 WL 6011067 (D.S.C. Dec. 17, 2021); *see also Jones v. Barnhart*, 364 F.3d 501, 504–05 (3d Cir. 2004) (noting that as long as there is sufficient development of the record and explanation to allow for judicial review, the ALJ is not required to use a particular format);. As for the remaining, less important factors, the ALJ must consider them, "but [is] not required to" expressly explain that consideration in the decision. 20 C.F.R. § 404.1520c(b)(2); *see also Morales v. Berryhill*, 484 F. Supp. 3d 130, 143 (S.D.N.Y. 2020) (noting where the ALJ's "reasoning and adherence to the regulation[s] are clear," a "slavish recitation of each and every" factor to be considered in analyzing a medical opinion is not required (quoting *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013))).

Here, the ALJ properly analyzed Dr. Faulks' statements in the "Disability Certificates" under the supportability and consistency factors, and his ultimate determination that the statements were unpersuasive was supported by substantial evidence. ECF No. 5-2 at 33. Addressing the supportability factor, the ALJ found that Dr. Faulks' "statements [were] supported by the findings and conclusions of Dr. Fa[u]lks following an in-person examination." *Id.* Turning to the

21

consistency factor, however, the ALJ found "the findings of Dr. Fa[u]lks" that Plaintiff was "partially incapacitated" or "totally incapacitated" were "not consistent with the objective record." *Id.* The ALJ explained:

> [T]he record indicates that the claimant's symptoms and conditions improved with treatment to the extent that the claimant is able to complete household chores such as cleaning, laundry, vacuuming and dishes, go shopping in stores, pay bills, count change, use a telephone, write emails, and to take walks for leisure   Such evidence suggest[s] that different limitations than those stated by Dr. Fa[u]lks are warranted.

*Id.* (citations omitted).  Earlier in his decision, the ALJ explained why such activities of daily living were material to his evaluation of Plaintiff's shoulder and knee symptoms— because they "generally require, among other things, the use of an individuals' upper extremities to reach and grasp, push and pull, and the use of an individual's lower extremities to walk." *Id.* at 31.  The ALJ also detailed the medical evidence that he found showed "claimant's symptoms and conditions improved with treatment" in his decision.[15]  *Id.* at 33.  For example, the ALJ found that "with treatment, the [Plaintiff's left] shoulder motion was well-preserved with reasonable strength in abduction" and "[a]n x-ray imaging study of her shoulder was unremarkable." *Id.* at 31.  As for her left knee, the ALJ found that "the record indicates that [Plaintiff] responded favorably to injections with good range of motion in her knee," and that Plaintiff was "noted to have good knee flexion and extension, which though diminished, was close to normal, rather 4+ out of a possible

---

[15] For the same reason, Plaintiff's claim that the ALJ did not cite any medical evidence contradicting Dr. Faulks' statements, is unavailing.  ECF No. 8-1 at 15.  While the ALJ did not delineate that evidence when discussing Dr. Faulks' statements, he did make direct reference to it, *see* ECF No. 5-2 at 30 ("[T]he record indicates that the claimant's symptoms and conditions improved with treatment . . . ."), and listed that evidence earlier in his decision, as discussed above, *see id.* at 33.  Proceeding in that fashion is satisfactory. ALJs are not required to explicitly list every piece of evidence supporting their conclusion as long as that evidence is discussed elsewhere in their opinion. *See Wonzell C. v. O'Malley*, No. 22-cv-3828, 2024 WL 3738819, at *16 (D.D.C. May 8, 2024) (finding no error in ALJ's decision when "inconsistencies between Dr. Narayan's opinion and other available medical evidence [were] readily apparent on review of the ALJ's opinion."), *report and recommendation adopted*, 2024 WL 3288070 (D.D.C. July 3, 2024); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (finding no error in the ALJ's decision when treatment records that displayed a medical opinion's inconsistency with the rest of the record were only listed prior to the discussion of the medical opinion); *Grant v. Astrue*, 857 F. Supp. 2d 146, 154 (D.D.C. 2012) (finding no error in the ALJ's decision when inconsistencies between a medical opinion and other evidence on the record were "clear from the ALJ's decision as a whole").

5." *Id.* Additionally, Plaintiff "maintained normal sensation in both her shoulder and knee, she at times denied joint pain and weakness, and the record indicates that at more than one examination, [Plaintiff] had normal range of motion, normal strength, and no tenderness to palpation." *Id.* On that basis, having considered both the supportability and consistency factors, the ALJ concluded that "the statements and opinions of Dr. Fa[u]lks [were] not persuasive." *Id.* at 33. The Court finds that conclusion was both consistent with the Social Security regulations and supported by substantial evidence. *See Wonzell C.*, 2024 WL 3738819, at *13 ("The ALJ pointed out several inconsistencies between Dr. King's medical opinion evidence and the rest of the evidence of record, which represent substantial evidence for discounting the corresponding conclusions that Dr. King advances.").

Seeking to avoid that result, Plaintiff advances two arguments. ECF No. 8-1 at 12, 15. First, she takes issue with the ALJ's finding that Dr. Faulks' statements were unpersuasive given that the ALJ found the physician's statements were supported by his examination of her. *Id.* at 12. Stated differently, as Plaintiff would have it, because the ALJ found that Dr. Faulks had provided some support for his statements, the ALJ should not have found his statements unpersuasive regardless of what the ALJ concluded with respect to the consistency of Dr. Faulks' statements with other evidence in the record. But that is not the law. While an ALJ must articulate their reasoning with respect to the supportability and consistency factors, "[t]he regulations do not prescribe a balancing test; they do not instruct that one, or either, of the two important factors— supportability and consistency—is dispositive; they do not require that both must militate in favor of or against the persuasiveness of a medical opinion." *Wonzell C.*, 2024 WL 3738819, at *15. As neither factor is dispositive, even when an ALJ may find a medical opinion supported, the ALJ can still properly reject the opinion as unpersuasive due to a lack of consistency with the objective

23

record. *See, e.g.*, *Crystal M. v. O'Malley*, No. 22-cv-2381, 2024 WL 6083881, at \*12 (D.D.C. July 11, 2024) ("[O]pinions that are inconsistent with the record can be unpersuasive even where the source includes some support for the opinion."); *Wonzell C.*, 2024 WL 3738819, at \*12 ("[T]he fact that a medical opinion is supported by a direct examination does not compel an ALJ to find it persuasive in its entirety—or at all."); *see also Goff v. Barnhart*, 421 F.3d 785, 790–91 (8th Cir. 2005) ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion."). That is what the ALJ did here. *See* ECF No. 5-2 at 33.

Finally, Plaintiff contends that the ALJ did not sufficiently discuss the consistency factor, as "the ALJ himself deemed [Dr. Faulks'] opinions supported *by Dr. Faulks'[] own records*." ECF No. 8-1 at 15 (emphasis added). That argument misapprehends what the consistency analysis requires. Under the Social Security regulations, that factor asks whether the medical source opinion is more or less "consistent . . . with the evidence from *other medical sources and nonmedical sources* in the claim," not from the medical source's own records. 20 C.F.R. § 404.1520c(c)(2) (emphasis added). In other words, the consistency factor requires analysis of "the consistency of the opinion *with other evidence in the record*." *David W. v. Kijakazi*, No. 21-cv-3370, 2023 WL 5035935, at \*10 (D.D.C. Aug. 8, 2023) (emphasis added). The ALJ here properly considered the consistency factor when he highlighted that Dr. Faulks' statements were inconsistent with other record evidence, including Plaintiff's own hearing testimony, showing that her shoulder and knee symptoms decreased with treatment. ECF No. 5-2 at 33; *see Monzon v. O'Malley*, No. 24-cv-162, 2024 WL 3819933, at \*5 (D.D.C. Aug. 15, 2024) ("An ALJ has sufficiently addressed consistency by noting a doctor's opined limitations are inconsistent with plaintiff's testimony."); *Kory D. v. Kijakazi*, No. 20-cv-3571, 2023 WL 6538543, at \*7 (D.D.C. Oct. 6, 2023) (finding the ALJ properly analyzed the consistency factor by describing differences

24

between medical opinion's findings and other evidence in the record); *McCraw v. Berryhill*, No. 17-cv-1011, 2019 WL 4222703, at \*4 (D.D.C. Sep. 5, 2019) ("An ALJ is generally not expected to provide more detail than citing to the contradictory evidence in his report.");.

In sum, the ALJ's evaluation of the supportability and consistency factors with respect to Dr. Faulks' statements was not erroneous and supported by substantial evidence.

### 2.    Activities of Daily Living

Separately, Plaintiff challenges the ALJ's use of evidence that Plaintiff could do household chores and other daily activities as a basis to reject Dr. Faulks' opinions. ECF No. 8-1 at 14.  This argument fails like the others.  The ALJ appropriately considered Plaintiff's daily activities, in addition to objective medical evidence in the record, in undermining Plaintiff's testimony and in finding Dr. Faulks' opinions unpersuasive.  Under the Social Security regulations, an ALJ may appropriately consider a claimant's daily activities when evaluating their subjective complaints about symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(i) ("Factors relevant to your symptoms, such as pain, which we will consider include . . . [y]our daily activities.").  That is what the ALJ did here. He found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms" related to her shoulder and knee impairments were "not entirely consistent with the medical evidence and other evidence in the record" based on Plaintiff's medical and treatment records and her hearing testimony about her capacity to perform activities of daily living.  ECF No. 5-2 at 30–34.  The ALJ then used the fact that Plaintiff's "symptoms and conditions improved with treatment to the extent that [she was] able to complete household chores" to conclude that "different limitations than those stated by Dr. Fa[u]lks [were] warranted."  *Id.* at 33.  Plaintiff nevertheless argues that it is "unclear how the activities the ALJ cited would refute Dr. Faulk's[] opinion."  ECF No. 8-1 at 14–15.  The ALJ's reasoning is not, in fact, hard to discern; indeed, he

25

provided it in his decision.  Again, the ALJ found unpersuasive Dr. Faulks' opinion that Plaintiff's shoulder and knee impairments left her either "totally" or "partially incapacitated," ECF No. 5-7 at 9, 12, because, in part, she was "able to complete household chores such as cleaning, laundry, vacuuming and dishes, go shopping in stores, pay bills, count change, use a telephone, write emails, and . . . take walks for leisure."  ECF No. 5-2 at 33.  Earlier in his decision, the ALJ explained why such specific activities of daily living were material to his evaluation:  because they "generally require[d], among other things, the use of an individual's upper extremities to reach and grasp, push and pull, and the use of an individual's lower extremities to walk."  *Id.* at 31. Stated different, the ALJ concluded that Plaintiff's shoulder and knee impairments did not leave her in any sense "incapacitated," as Dr. Faulks opined, because she testified that she engaged in many different activities of daily living that required their active use.

Plaintiff's related argument that "[i]t is unclear how Plaintiff's ability to perform minimal activities of daily living with whatever breaks and rest she needed was commensurate with full-time employment on a regular and consistent basis" also falls flat.  ECF No. 8-1 at 12.  The ALJ never made such a claim.  He did not assert that Plaintiff was capable of full-time work because of her ability to complete household chores, but instead appropriately referenced Plaintiff's capacity to perform those daily activities as one basis to undermine her testimony that her symptoms were as severe and limiting as she alleged or as Dr. Faulks' opined.  ECF No. 5-2 at 31 ("Indeed, such evidence suggests that the claimant's symptoms do not limit the claimant to the degree which has been alleged, and rather, suggest that the claimant is capable of functioning as set forth in the residual functional capacity[.]"); *id.* at 33 ("Such evidence suggest[s] that different limitations than those stated by Dr. Fa[u]lks are warranted.").  Such analysis of a claimant's capacity to perform daily activities is consistent with the case law.  *See Bullock v. Kijakazi*, No.

26

20-cv-1764, 2023 WL 5023380, at *6 (D.D.C. Aug. 8, 2023) ("[T]he ALJ did not reason that Mr. Bullock's activities of daily living were as demanding as those of full-time work. Rather, the ALJ considered Mr. Bullock's activities to determine whether his symptoms were as severe and limiting as he alleged." (citation modified) (quoting *Jeske v. Saul*, 953 F.3d 583, 592–93 (7th Cir. 2020))); *Laura A.*, 2022 WL 3644810, at *16 ("Nowhere does [the ALJ] state or suggest that Plaintiff's ability to perform activities in and around the home necessarily means she can perform light work.").

In any event, Plaintiff's complaints concerning the ALJ's consideration of her activities of daily living do not constitute grounds for remand because his discussion of them formed just one part of his decision. In addition to the evidence concerning her daily activities, the ALJ also considered the objective medical evidence, treatment records, and opinion evidence in evaluating Plaintiff's subjective complaints about her symptoms. ECF No. 5-2 at 30–34. More, the ALJ specifically found that the medical evidence in the record conflicted with Plaintiff's reported symptoms. *Id.* at 31. Again, the ALJ found that "with treatment, the [Plaintiff's left] shoulder motion was well-preserved with reasonable strength in abduction" and "[a]n x-ray imaging study of her shoulder was unremarkable." *Id.* As for her left knee, the ALJ found that "the record indicates that [Plaintiff] responded favorably to injections with good range of motion in her knee," and that Plaintiff was "noted to have good knee flexion and extension, which though diminished, was close to normal, rather 4+ out of a possible 5." *Id.* Additionally, Plaintiff "maintained normal sensation in both her shoulder and knee, she at times denied joint pain and weakness, and the record indicates that at more than one examination, [Plaintiff] had normal range of motion, normal strength, and no tenderness to palpation." *Id.* In so doing, the ALJ "did not solely rely on evidence regarding [the Plaintiff's] daily activities" to determine that her subjective complaints were not

27

persuasive, and he "provided a sufficient 'logical bridge' linking the record evidence to his evaluation of Plaintiff's subjective complaints to satisfy the substantial evidence requirement." *Colter v. Kijakazi*, No. 20-cv-632, 2022 WL 715218, at \*14–15 (D.D.C. Mar. 10, 2022); *see also Bullock*, 2023 WL 5023380, at \*6 ("'More importantly, . . . the ALJ here did not rely solely on the discrepancies between Plaintiff's testimony and his daily activities in concluding that his symptoms were not disabling.' 'Instead, the ALJ considered Plaintiff's medical records, treatment records, and the opinions of medical experts[.]'" (citation modified) (first quoting *Laura A.*, 2022 WL 3644810, at \*17; and then quoting *Colter*, 2022 WL 715218, at \*4)); *Shea M. v. Kijakazi*, No. 21-Cv-2204, 2023 WL 3040602, at \*16 (D.D.C. Apr. 21, 2023) ("Ultimately, Plaintiff's complaints as to this part of the ALJ's analysis do not constitute grounds for remand because the ALJ's discussion of Plaintiff's daily activities formed just one part of a decision that was further supported by opinion evidence and objective medical evidence.").

3.      Cherry-Picking

In Plaintiff's final attempt to show that "the ALJ failed to engage in any meaningful evaluation of Dr. Faulks'[] opinions," she argues the ALJ cherry-picked the record by not mentioning her "periods of exacerbation and worsening." ECF No. 8-1 at 15. This argument too falls short.

When ruling on a claim, "an ALJ is obligated to consider all relevant evidence but is not required to discuss every piece of evidence submitted." *Masie N. v. Dudek*, No. 22-cv-2224, 2025 WL 785380, at \*8 (D.D.C. Mar. 12, 2025). However, an ALJ should still ensure that evidence contrary to the Commissioner's decision be at least "minimally discuss[ed]." *Emery P. v. Kijakazi*, No. 21-cv-3147, 2023 WL 5973991, at \*6 (D.D.C. Sep. 14, 2023) (quoting *Lane-Rauth*, 437 F. Supp. 2d at 67). If that minimal standard is met, "the Commissioner's finding must be sustained

28

even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the Commissioner's." *Masie N.*, 2025 WL 785380, at *8 (quoting *Ali v. Colvin*, 236 F. Supp. 3d 86, 90 (D.D.C. 2017)).

Here, the ALJ discussed the contrary evidence. He acknowledged that Plaintiff "reported joint stiffness and that her knee gave way and that she used a walker for balance and treated knee pain with oxycodone and gabapentin as well as injections after she did not receive any relief from non-prescription medication and muscle relaxers." ECF No. 5-2 at 31. He also discussed that "[d]espite such medications, [Plaintiff] reported experiencing pain while walking[;] . . . [s]he also reported numbness and pain in her left upper extremity and shoulder[;] . . . [and she] had restricted range of motion [in] both." *Id.* And he expressly acknowledged that "although the record does indicate improvement, the [Plaintiff] experienced both shoulder and knee pain which she treated with prescription medication throughout the adjudicatory period." *Id.* at 33. The ALJ also discussed Plaintiff's reports that she had "an inability to engage in substantial gainful activity-level work due to health problems," and he detailed Plaintiff's reported troubles performing daily activities and household chores. *Id.* at 30 ("The claimant stated that her symptoms and conditions prevent her from engaging in her hobbies as often as she would like[,] . . . stated she is able to complete some household chores but must rest in between[,] . . . and reported some problems in completing personal care[.]"). So, the ALJ did address the contrary evidence concerning Plaintiff's pain and symptoms. Indeed, the ALJ rejected the opinions of consulting doctors who concluded that Plaintiff had "no medically determinable impairment" because he found those opinions were "not consistent with the objective record" which showed that Plaintiff "experienced both shoulder and knee pain which she treated with prescription medication." *Id.* at 32. Ultimately, while the ALJ found that "[t]he foregoing does not mean [Plaintiff] does not have

substantial limitation," he concluded that "the evidence of record suggests that [Plaintiff's] impairments do not limit her to the extent alleged," and her actual impairments were sufficiently accommodated by the restrictions the ALJ imposed in Plaintiff's RFC, which were not zero. *Id.*

It is the ALJ's prerogative to make that determination. That is, it is the province of the ALJ to weigh conflicting evidence in the record and determine which evidence is more credible. *See Pond v. Kijakazi*, No. 21-cv-912, 2023 WL 3816687, at *7 (D.D.C. June 5, 2023) ("The ALJ credited Ms. Pond's testimony in making the RFC determination over Dr. Jefferies's opinion. And again, this Court may not disturb the ALJ's decision regarding the weight of the evidence."); *Bennett v. Saul*, No. 18-cv-1745, 2019 WL 5549815, at *11 (D.D.C. Oct. 27, 2019) ("In such [conflicting evidence] situations, 'the responsibility for that decision falls on the [Commissioner] (or [his] designate, the ALJ).' Where the ALJ credits and discredits certain medical opinions based on conflicting evidence in the record, it is not for the Court to reweigh the evidence." (alterations in original) (citation omitted) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987))). It is beyond the scope of this Court's review on appeal to reweigh that evidence and reach a different conclusion than the ALJ, whatever it may have done in the first instance. *See David W.*, 2023 WL 5035935, at *9 ("[T]he ALJ considered the evidence in the record of Plaintiff's limitations, including his testimony of debilitating symptoms, and explained why he found other record evidence to the contrary more persuasive. That is all that the ALJ was required to do, and given

that he did so, the court is not permitted to substitute its own judgment for that of the Commissioner." (citation omitted)).

### IV.   CONCLUSION

For the reasons stated above, the Court will enter an Order **DENYING** Plaintiff's motion for judgment of reversal, ECF No. 8, and **GRANTING** Defendant's motion for judgment of affirmance, ECF No. 10.

Date: April 9, 2026

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

31